**Opinion issued August 22, 2024**



In The

# Court of Appeals

For The

## First District of Texas

———————————

**NO. 01-23-00099-CR**

———————————

**ISAIAH KAIN SALAS-MARTINEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1799164**

---

**MEMORANDUM OPINION**

A jury convicted appellant Isaiah Kain Salas-Martinez ("Martinez")[1] of first-

degree murder, and the trial court sentenced him to twelve years' confinement.[2] In

---

[1]  In this opinion, we refer to Martinez by his preferred name.

[2]  *See* TEX. PENAL CODE §§ 19.02(b)(1)–(3), (c), 12.32(a).

four issues on appeal, Martinez argues that: (1) the trial court erred by including in the self-defense portion of the jury charge an instruction on Penal Code section 46.02, which he contends violated his rights under the Second and Fourteenth Amendments; (2) his trial counsel provided ineffective assistance by failing to object to inclusion of section 46.02 in the jury charge; (3) the evidence was legally insufficient to support the jury's guilty verdict; and (4) the trial court abused its discretion by denying his request to admit certain impeachment evidence. We affirm.

## Background

On the evening of December 16, 2017, Amy Sovinsky and Jonathan Fernandez hosted a small party at their house.[3] Amy and Jonathan had a baby together and lived with Amy's parents, but Amy's parents and the baby were away from home for the night. Amy and Jonathan invited a few friends, most of whom they knew from high school, to the party. Approximately ten people attended. Relevant here, Jonathan invited his cousin, Michael Longoria. Michael invited his friend, Chase Harrell, who attended college out of town but was home visiting his family in Houston during the winter break. Chase took his brother, Cole Harrell, the complainant. Amy invited her friend Alexis Quezada, who is Martinez's girlfriend.

---

[3] We refer to persons other than Martinez by their first names for clarity.

Martinez was not invited to the party because he did not know anyone there.[4] The partygoers drank alcohol and played drinking games.

By the early hours of December 17, only Amy, Jonathan, Alexis, Michael, Chase, and Cole remained at Amy's house. While they socialized in the kitchen, Alexis became sick or intoxicated and went upstairs to sit in the movie room. Michael followed her upstairs to check on her. Within a few minutes after entering the movie room, Alexis said she needed to throw up. She rushed to a nearby bathroom but vomited in the hallway. Michael called downstairs from the balcony to let the others know that Alexis had vomited upstairs. Amy, Jonathan, Chase, and Cole went upstairs. Jonathan cleaned up the vomit, and then he, Michael, Chase, and Cole returned downstairs to the kitchen. Amy took Alexis into a bathroom, helped her shower, gave her some clothes to wear, and helped her into Amy's bed to rest. Amy then went back downstairs and rejoined the others.

A little while later, Michael returned upstairs to check on Alexis. Alexis asked him if he had seen anybody touch or try to touch her inappropriately, but Michael said he had not and returned downstairs. Around 2:30 a.m., Amy went upstairs to check on Alexis. She found Alexis sitting in the bathroom talking to Martinez on the phone. Alexis was crying, and she told Martinez that someone had tried to touch her.

---

[4]     The appellate record indicates that Martinez had previously met Amy and had been to her house one time, but they were not social acquaintances. Martinez and the other males at the party did not know each other.

3

Martinez testified at trial that he was asleep at home when he received a FaceTime call from Alexis. Martinez could see her sitting in a bathtub, crying and hysterical. She asked him to pick her up from Amy's house because "[s]he had been assaulted, sexually assaulted." Amy then took the phone from Alexis and left the room. Amy and Martinez spoke with each other for several minutes, and Amy gave Martinez her address.

Upon hearing Alexis's accusation that she was sexually assaulted, Martinez decided to go to Amy's house to pick up Alexis. He got out of bed and dressed himself. Then he grabbed a shotgun and handgun. He claimed that the shotgun was unloaded. He put the handgun, which was loaded, in a holster in the waistband of his pants. He then drove over to Amy's house. On the way, he called Alexis's phone two more times, including once to get the code to enter the gate into Amy's neighborhood. Amy answered Alexis's phone both times and spoke to Martinez.

When Martinez arrived at Amy's house, Amy told Jonathan that Alexis's boyfriend was there to pick her up. She then went to the front door, opened it, and saw Martinez standing there "with a shotgun across his chest." Neither person said anything. Instead, Amy ran away from Martinez and hid in a vacant lot next door. Martinez entered the house in search of Alexis. From the front door, he proceeded to the back of the house towards the kitchen area. Jonathan, Michael, Chase, and Cole were on the back patio immediately outside the kitchen. As Martinez

4

approached the kitchen area, Jonathan entered the kitchen through the back door. Jonathan testified that when he saw Martinez, Martinez was pointing the shotgun at his face. Michael also testified that he looked through the blinds from the back patio and saw Martinez pointing the shotgun at Jonathan's face. Martinez denied that he pointed the shotgun at Jonathan and testified that he instead asked Jonathan, "Where is she?"

Jonathan immediately pushed the barrel of the shotgun away from his face, and he and Martinez began fighting. They knocked over the kitchen table and fell to the ground, causing the shotgun to fly away from them. Martinez ended up face-down on the ground with Jonathan on his back. Hearing the commotion inside, Michael, Chase, and Cole ran into the kitchen to help Jonathan fight Martinez. While face down on the ground with the others on top of him, Martinez reached down and pulled the handgun out of his waistband. He testified that he tried holding the gun as far away as possible to keep the others from taking it. Martinez disputed pulling the trigger, but he had control of the gun when it fired three shots and jammed on a fourth attempted firing. Jonathan managed to grab the gun from Martinez and empty the bullets from the magazine. The fight was brief and ended after Jonathan obtained control of the gun.

Unbeknownst to Jonathan, Michael, and Martinez, Cole was standing only a few inches in front of the barrel of the gun when it fired, and one of the bullets had

hit him. The bullet pierced Cole's heart, both lungs, and several ribs. Cole immediately quit fighting and left through the back door. Chase followed him. Realizing Cole had been shot, Chase called 911. But Cole collapsed and died as Chase stood over him, trying to remember Amy's address to give to the dispatcher. Amy overheard Chase's 911 call while hiding in the vacant lot next door, and she peeked over the fence and gave her address to the dispatcher.

Back inside, when the fight ended, Jonathan, Michael, and Martinez remained in the kitchen with Alexis, who had come downstairs at some point during the fight. Martinez picked up his shotgun off the floor and asked Jonathan to return his other gun to him. Jonathan refused. Alexis left Amy's house with Martinez, and they drove to a nearby gas station. They waited there for several hours before returning separately to Amy's house to meet with law enforcement officers.

Michael also called 911 and reported the shooting. He then drove Jonathan around the neighborhood looking for Amy, who they had not seen since the fight with Martinez. Jonathan still had possession of Martinez's gun, and he discarded the gun in some bushes near the front gate of the neighborhood. While driving in the neighborhood, Michael was stopped by the first officer responding to the 911 calls. The officer briefly spoke to Jonathan and Michael before they all returned to Amy's house. Back at Amy's house, Jonathan found that the front door was locked. He and

6

Michael were standing on the front porch when they heard over the officer's radio that someone had been shot and killed at Amy's address.

A few hours after the shooting, Martinez returned to Amy's house with his father, and Alexis returned to Amy's house with her sister. Police officers separated everyone who had been at Amy's house during the shooting and interviewed them. Officers conducted gunshot residue tests on Martinez, Jonathan, Michael, and Chase. Police also recovered Martinez's handgun and shotgun.

Martinez was indicted for the first-degree felony offense of murder based on three theories: (1) he intentionally or knowingly caused Cole's death by shooting him with a firearm; (2) he intentionally caused serious bodily injury and committed an act clearly dangerous to human life by shooting Cole with a firearm causing Cole's death; and (3) he committed the felony offense of aggravated assault with a deadly weapon by threatening Jonathan, Michael, Chase, Cole, and Amy with imminent bodily injury while using or exhibiting a deadly weapon, and while doing so, he committed or attempted to commit an act clearly dangerous to human life by discharging a firearm causing Cole's death. *See* TEX. PENAL CODE § 19.02(b)(1)–(3), (c); *see also id.* § 22.02(a)(2) (aggravated assault).

Numerous witnesses testified at trial, including Amy, Alexis, Jonathan, Michael, and Chase. Law enforcement officers who responded to the 911 calls and investigated the shooting also testified. Martinez testified in his defense.

Alexis testified that she believed Jonathan had sexually assaulted her during the party. Amy testified, however, that Jonathan could not have done so because he was downstairs with her and the others when Alexis alleged she was sexually assaulted. Martinez twice requested that the trial court permit him to impeach Amy's testimony by introducing evidence that Amy knew Jonathan had "inappropriately touched" two other women in the past. The trial court denied both requests.

On the final day of trial, the trial court held a hearing on the jury charge. Neither party objected to the charge. After deliberating, the jury found Martinez guilty of murder. The trial court sentenced him to twelve years' confinement. This appeal followed.

**Jury Charge**

In his first issue, Martinez argues that the jury charge erroneously included an instruction on Penal Code section 46.02, which violated his right to carry a firearm in public under the Second and Fourteenth Amendments.

**A.      Standard of Review and Governing Law**

The trial court must deliver to the jury a written charge "distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. The purpose of the jury charge is to inform the jury of the applicable law and guide the jury in applying it to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (quoting *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)).

8

We review complaints of jury charge error using a two-step process. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). First, we determine whether the charge is erroneous. *Id.* If so, then we must decide whether the error caused the defendant harm. *Id.* When, as here, the defendant did not object to the jury charge in the trial court, the defendant must show "egregious harm" to obtain a reversal. *Id.*

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend II. The United States Supreme Court has construed the Second Amendment, along with the Fourteenth Amendment, to "protect an individual's right to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022).

In this case, the challenged instruction appeared in the self-defense portion of the jury charge. The Texas Penal Code authorizes the use of self-defense. With exceptions, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a). A person is justified in using *deadly* force against another when the actor would be justified in using force under section 9.31 and "when and to the degree the actor reasonably believes the deadly force is immediately necessary" either "to protect the actor against the other's use or attempted use of unlawful

9

deadly force" or "to prevent the other's imminent commission" of several enumerated offenses, including sexual assault. *Id.* § 9.32(a).

A person is *not* justified in using force under several circumstances, including "in response to verbal provocation alone" or "if the actor provoked the other's use or attempted use of unlawful force . . . ."[5] *Id.* § 9.31(b)(1), (4). Additionally, use of force is not justified "if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was . . . carrying a weapon in violation of Section 46.02[.]" *Id.* § 9.31(b)(5)(A). A person violates Penal Code section 46.02 if the person intentionally, knowingly, or recklessly carries a handgun and the person is not on the person's property or inside of or directly en route to the person's vehicle or watercraft.[6] *Id.* § 46.02(a).

---

[5] Even where the actor provoked the other's use or attempted use of unlawful force, the actor's use of force is justified if "the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter," and the other "continues or attempts to use unlawful force against the actor[.]" *Id.* § 9.31(b)(4).

[6] In September 2021—after the incident made the basis of this criminal proceeding— the Legislature amended section 46.02(a) to apply only to a person who was younger than 21 years of age or who was previously convicted of certain offenses at the time of the charged offense. Act of May 24, 2021, 87th Leg., R.S., ch. 809, § 22, sec. 46.02(a), 2021 Tex. Gen. Laws 1960, 1967 (current version at TEX. PENAL CODE § 46.02(a)). The version of section 46.02(a) in effect at the time of the underlying offense did not include either of these provisions. *See* Act of May 24, 2017, 85th Leg., R.S., ch. 1049, § 4, sec. 46.02, 2017 Tex. Gen. Laws 4106, 4107–08. Unless otherwise noted, citations in this opinion to section 46.02(a) are to the version in effect at the time of the offense.

**B.** **Analysis**

The self-defense instructions in the jury charge began by stating when a person is justified in using force or deadly force in self-defense. *See id.* §§ 9.31(a), 9.32(a). This portion of the charge also provided that self-defense does not apply in response to verbal provocation alone. *See id.* § 9.31(b)(1). Following these instructions, the charge provided the following "qualification on the law of self-defense" under section 9.31(b)(5):

> You are further instructed, as a qualification on the law of self-defense, that the use of force by a defendant against another is not justified if the defendant sought an explanation from or discussion with the other person concerning the defendant's differences with the other person while the defendant was carrying a weapon in violation of Penal Code Section 46.02.
>
> A person violates Section 46.02 of the Penal Code if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun, illegal knife, or club if the person is not:
>
> 1) on the person's own premises or premises under the person's control; or
>
> 2) inside of or directly enroute to a motor vehicle or watercraft that is owned by the person or under the person's control.
>
> \* \* \* \*
>
> Now therefore, if you find and believe from the evidence beyond a reasonable doubt that the force, if any, used by the defendant against Cole Harrell or others acting with him, was at a time when the defendant was seeking an explanation from or a discussion with Cole Harrell or others acting with him, concerning the defendant's differences with Cole Harrell or others acting with him, but at that time the defendant was unlawfully carrying a handgun in violation of Penal Code Section 46.02, then you will find against the defendant on the issue of self-defense.

*See id.* § 9.31(b)(5). On appeal, Martinez does not challenge the constitutionality of section 9.31(b)(5) or its inclusion in the jury charge. Rather, he challenges only the constitutionality of section 46.02(a). To support this argument, Martinez relies on two opinions.

In *New York State Rifle and Pistol Association, Inc. v. Bruen*, the United States Supreme Court struck down a New York law that required ordinary, law-abiding residents to demonstrate "proper cause"—or "a special need for self-defense"—to obtain a license to carry a handgun in public places. 597 U.S. at 11–12. The Court held that this law violated the Second and Fourteenth Amendments, which "protect an individual's right to carry a handgun for self-defense outside the home."[7] *Id.* at 10.

Significantly, *Bruen* established a two-step test for courts to analyze Second Amendment challenges. *Id.* at 17. First, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* Second, the government bears the burden to justify a challenged regulation by demonstrating that it "is consistent with this Nation's historical

---

[7]    The Court explained that the Fourteenth Amendment applied to the New York law because "New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," but "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 37 (2022) (citations omitted).

tradition of firearm regulation." *Id.* The Court acknowledged that this "[h]istorical analysis can be difficult" because "it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Id.* at 25 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 803–04 (2010) (Scalia, J., concurring)). Indeed, the Court considered a vast amount of "historical evidence" relied upon by Bruen, the Superintendent of State Police, to justify the proper-cause requirement in New York's handgun licensing law. *See id.* at 34, 38–70 (considering State's evidence containing "a variety of historical sources from the late 1200s to the early 1900s"). Ultimately, the Court concluded that Bruen did not meet the State's "burden to identify an American tradition justifying the State's proper-cause requirement" in the handgun licensing statute. *Id.* at 70.

A few months after *Bruen*, the Northern District of Texas issued an opinion concerning a "challenge [to] the constitutionality of Texas's statutory scheme that prohibits law-abiding 18-to-20-year-olds from carrying handguns for self-defense outside the home." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 745 (N.D. Tex. 2022). The two plaintiffs, who were between the ages of 18 and 20, wanted to carry a handgun while traveling between home, work, and school, but they were unable to do so because carrying a handgun under these circumstances violated Texas law. *Id.* at 745, 746. When the plaintiffs filed suit, Penal Code section 46.02 applied only to individuals younger than age 21, and it prohibited such individuals

from carrying a handgun unless they were on their property or inside or directly en route to their motor vehicle or watercraft. *Id.* at 745 (citing current version of TEX. PENAL CODE § 46.02(a)). This provision did not apply to individuals licensed to carry a handgun, but, with few exceptions not applicable to the plaintiffs, a separate statute prohibited individuals under age 21 from obtaining a license to carry a handgun. *Id.* (citing TEX. GOV'T CODE § 411.172(a)(2), (g)–(i)). Thus, the plaintiffs sued the Director of the Department of Public Safety seeking "to enjoin only provisions [of Texas law] that prohibit them from applying for a license to carry a handgun." *Id.* at 753. The plaintiffs then filed a motion for summary judgment on the ground that the statutory licensing scheme violated their Second Amendment right to carry a handgun. *Id.* at 745, 753.

Applying *Bruen*'s two-part test for Second Amendment challenges, the *McCraw* court first concluded that the plain text of the Second Amendment covered the proposed course of conduct—that is, permitting "law-abiding 18-to-20-year-olds to carry a handgun for self-defense outside the home." *Id.* at 751. Turning to the second step, the court concluded that the State did not meet its burden to justify the licensing scheme as "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 754–56. In attempting to meet this burden, the State relied solely on a Fifth Circuit opinion deciding a Second Amendment challenge under a pre-*Bruen* test. *See id.* ("Texas argues that the 'thorough and compelling' historical

14

analysis in *NRA* satisfies this burden.") (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives ("NRA")*, 700 F.3d 185 (5th Cir. 2012), *abrogated by Bruen*, 597 U.S. at 17, 19 n.4). The *McCraw* court disagreed with the State's reliance on *NRA*, criticizing the opinion for "fail[ing] to conduct a tailored historical analysis." *Id.* at 754. Because "Texas failed to produce sufficient historical analogs from the Founding Era *and* the Reconstruction Era to support its statutory" handgun licensing scheme, the court "enjoin[ed] the Texas laws to the extent they prohibit law-abiding 18-to-20-year-olds from applying for a license to carry a handgun." *Id.* at 756.

We find *Bruen* and *McCraw* distinguishable from the circumstances presented here. Both cases concerned constitutional challenges to licensing statutes; they were not criminal proceedings. More importantly, neither case addressed the issue presented here: whether a state can preclude a defendant charged with murder from asserting the defense of self-defense when the defendant sought an explanation or discussion about differences while carrying a firearm. *Bruen* did not mention or address the constitutionality of Texas Penal Code section 46.02.

*McCraw* did address section 46.02(a) and held that "[t]o the extent that Texas's statutory scheme, [including section 46.02(a)], prohibits law-abiding 18-to-20-year-olds from carrying handguns for self-defense outside the home based solely on their age, this statutory scheme violates the Second Amendment" and Fourteenth

15

Amendment. *Id.* at 758. But *McCraw* only addressed section 46.02(a) in the context of "Texas's statutory scheme" for handgun licensing. *See id. McCraw* did not address whether section 46.02(a), as applied in the context of defenses to a murder charge, would likewise violate the Second Amendment. The licensing context in which *McCraw* was decided distinguishes it from this criminal case.

Furthermore, *McCraw* based its holding solely on the State's failure to meet its burden to produce evidence justifying the law prohibiting certain individuals from obtaining a license to carry a handgun. *Id.* at 756 (concluding that "Texas failed to produce sufficient historical analogs from the Founding Era *and* the Reconstruction Era to support its statutory prohibition" on allowing individuals under age 21 from applying for handgun license). In this case, the State was deprived of an opportunity to meet its burden under *Bruen* because Martinez failed to raise a Second Amendment challenge in the trial court. *See* 597 U.S. at 17. Consequently, this Court lacks a sufficient record from which we can undertake our own *Bruen* analysis of Martinez's claim of jury charge error. *See, e.g.*, *id.* at 17, 38–70.

We therefore conclude that Martinez has not established that his Second or Fourteenth Amendment rights were violated by inclusion of instructions referencing section 46.02(a) in the self-defense portion of the jury charge. We hold that Martinez has not established on the record before us that the jury charge contained error. *See Alcoser*, 663 S.W.3d at 165. We overrule Martinez's first issue.

16

**Ineffective Assistance of Counsel**

In his second issue, Martinez contends that his trial counsel provided ineffective assistance by failing to object to inclusion of section 46.02 in the self-defense instructions in the jury charge.

## A.     Standard of Review and Governing Law

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to have the effective assistance of counsel for his defense. U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("[T]he right to counsel is the right to the effective assistance of counsel.") (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To prevail on a claim of ineffective assistance of counsel, a defendant must prove that (1) counsel was deficient; and (2) the deficiency prejudiced the defense. *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023) (citing *Strickland*, 466 U.S. at 687); *Dryer v. State*, 674 S.W.3d 635, 646 (Tex. App.—Houston [1st Dist.] 2023, pet. ref'd). The defendant bears the burden to prove both prongs of ineffective assistance by a preponderance of the evidence. *Dryer*, 674 S.W.3d at 646. If the defendant does not meet his burden to prove both prongs, we cannot sustain the claim of ineffective assistance of counsel. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011); *Dryer*, 674 S.W.3d at 646. "The purpose of this two-pronged test is to assess whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot

be said to have produced a reliable result." *Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013); *Dryer*, 674 S.W.3d at 646.

Under the first prong, defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *Hart*, 667 S.W.3d at 781; *Dryer*, 674 S.W.3d at 646. We are highly deferential to counsel's performance. *Dryer*, 674 S.W.3d at 646. A "strong presumption" exists that "counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Hart*, 667 S.W.3d at 781 (quoting *Strickland*, 466 U.S. at 689) (internal quotations omitted). Reviewing courts should consider the reasonableness of counsel's actions at the time they occurred rather than viewing the actions with the benefit of hindsight. *Id.* at 782.

Under the second prong—prejudice to the defense—we consider whether a reasonable probability exists that but for counsel's deficient performance, the trial outcome would have been different. *Dryer*, 674 S.W.3d at 647. A reasonable probability is one that undermines our confidence in the outcome of trial. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Ineffective assistance claims "must be firmly rooted in the record." *Hart*, 667 S.W.3d at 782; *Dryer*, 674 S.W.3d at 647. "Under most circumstances, the record

18

on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Hart*, 667 S.W.3d at 782 (quoting *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004)); *Dryer*, 674 S.W.3d at 647 ("It is rare that the trial record, standing alone, is sufficient to show deficient performance by counsel."). Whether counsel's decisions were reasonable often depends on facts that do not appear in the record. *Dryer*, 674 S.W.3d at 647. Thus, counsel ordinarily should be afforded an opportunity to explain his conduct before we will find that his performance was deficient. *Hart*, 667 S.W.3d at 782; *Dryer*, 674 S.W.3d at 647. When no such opportunity has been afforded, we cannot find counsel's performance deficient unless the challenged conduct was so outrageous that no competent lawyer would have engaged in it. *Hart*, 667 S.W.3d at 782; *Dryer*, 674 S.W.3d at 647. We generally will assume that counsel had a reasonable strategic motive if any reasonable trial strategy can be imagined. *Dryer*, 674 S.W.3d at 647.

A defendant is not entitled to errorless representation. *Id.* We therefore consider the totality of the representation when reviewing an ineffective assistance claim. *Id.* A single error will rarely prove that counsel was ineffective. *Id.* To show counsel was ineffective based on a single error, the error must have been "egregious and had a seriously deleterious impact on counsel's representation as a whole." *Id.*

19

**B.    Analysis**

Martinez's arguments concerning his second issue are substantially similar to those concerning his first issue. Martinez argues that his trial counsel had a duty to identify potential legal issues and object accordingly. He argues that had counsel objected to the jury charge on the ground that it included an instruction on section 46.02, the trial court would have modified the charge "in such a way that the jury could have found (and likely would have found) that Martinez was justified in using whatever force he used on December 17, 2017, because he believed that force was reasonably necessary to prevent imminent harm to either himself or Alexis."

Legal counsel "must be sufficiently abreast of developments in criminal law aspects implicated in the case at hand," and "[i]gnorance of well-defined general laws, statutes and legal propositions is not excusable and . . . may lead to a finding of constitutionally deficient assistance of counsel." *Ex parte Lane*, 670 S.W.3d 662, 671 (Tex. Crim. App. 2023) (quotations omitted). However, to be deficient, "the specific legal proposition" which counsel failed to assert must be "well considered and clearly defined." *Id.* (quotation omitted). Thus, in reviewing trial counsel's performance, we consider "the state of the law in effect during the time of trial," and "we will not find counsel ineffective where the claimed error is based upon unsettled law." *Id.* (quotation omitted).

As in his first issue, Martinez relies on *Bruen* and *McCraw* to support his argument that his trial counsel should have known that section 46.02(a) was unconstitutional. Martinez correctly notes that both opinions issued prior to trial in this case and before the charge was read to the jury. But as discussed above, neither *Bruen* nor *McCraw* is dispositive on the issue presented here: whether the State may preclude the defense of self-defense in a murder prosecution when the defendant sought an explanation or discussion about differences while carrying a firearm. Thus, on the record and briefs before us, "the specific legal proposition" which Martinez contends counsel failed to assert was not "well considered and clearly defined." *See id.* (quotation omitted); *Ex parte Salinas*, 664 S.W.3d 894, 909 (Tex. Crim. App. 2022) ("[W]e do not ordinarily declare counsel to have performed deficiently for failing to invoke unsettled legal principles," which would require courts to "indulge in the kind of retrospective evaluation that *Strickland* forbids."); *see also Hart*, 667 S.W.3d at 782 (stating that ineffective assistance claims "must be firmly rooted in the record").

Moreover, counsel was not provided an opportunity to explain his challenged conduct, and we cannot conclude that counsel's failure to object to the charge's inclusion of section 46.02 was so outrageous that no competent lawyer would have failed to so object. *See Hart*, 667 S.W.3d at 782; *Dryer*, 674 S.W.3d at 647. Therefore, Martinez has not met his burden to establish that his counsel was

21

deficient. We hold that on the record before us, Martinez has not established that his trial counsel was ineffective. We overrule Martinez's second issue.

**Sufficiency of the Evidence**

In his third issue, Martinez contends that the evidence admitted at trial was legally insufficient to support the jury's findings that he committed the offense of murder and that he was not justified in using force in self-defense or defense of a third person.

## A. Standard of Review and Governing Law

The Due Process Clause of the Fourteenth Amendment requires a criminal conviction to be supported by legally sufficient evidence. *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979), and *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010) (Cochran, J., concurring)). Evidence is legally sufficient to support a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict without reweighing the evidence, substituting our judgment for that of the jury, or acting as a thirteenth juror. *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Dunham*, 666 S.W.3d at 482.

"This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *McPherson*, 677 S.W.3d at 664 (quoting *Jackson*, 443 U.S. at 319). The jury is the sole judge of the credibility and weight to be attached to witnesses' testimony. *Dunham*, 666 S.W.3d at 482. "The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all the evidence or testimony proffered, and weigh the evidence as it sees fit." *Mottin v. State*, 634 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). When the record supports conflicting inferences, we presume that the jury resolved conflicts in favor of the verdict, and we defer to that determination. *Dunham*, 666 S.W.3d at 482 (quotation omitted). Each fact need not point directly and independently to the defendant's guilt as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.* (quotation omitted). We treat direct evidence and circumstantial evidence equally, and circumstantial evidence alone can be sufficient to establish guilt. *Id.* (quotation omitted).

When, as here, a defendant raises self-defense or defense of a third person, the defendant bears the burden to produce evidence supporting the defense, but the State bears the burden of persuasion to disprove the raised issues. *Braughton*, 569 S.W.3d at 608 ("The State's burden of persuasion 'is not one that requires the

23

production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'") (quotation omitted). Thus, the State must both prove the essential elements of the offense beyond a reasonable doubt and persuade the jury that the defendant did not act in self-defense or defense of a third person beyond a reasonable doubt. *Id.* at 609 (quotation omitted); *Rankin v. State*, 617 S.W.3d 169, 181–82 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). The evidence is legally insufficient if, when viewed in the light most favorable to the verdict, either (1) the record contains no evidence or a mere "modicum" of evidence probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *Rankin*, 617 S.W.3d at 182.

## B. Analysis

Like the indictment, the jury charge provided three theories under which the jury could convict Martinez of the offense of murder: (1) he intentionally or knowingly caused Cole's death by shooting him with a deadly weapon; (2) he intentionally caused serious bodily injury and intentionally or knowingly committed an act clearly dangerous to human life by shooting Cole with a deadly weapon causing Cole's death; or (3) he committed or attempted to commit the felony offense of aggravated assault with a deadly weapon by intentionally or knowingly threatening Jonathan, Chase, Cole, Micheal, and Amy with imminent bodily injury while using or exhibiting a deadly weapon, and while committing or attempting to

24

commit this felony offense, he committed or attempted to commit an act clearly dangerous to human life by discharging a deadly weapon causing Cole's death.[8] *See* TEX. PENAL CODE § 19.02(b)(1)–(3).

Under the first two theories, Martinez argues that the evidence was insufficient to support the jury's findings that he intentionally or knowingly fired his gun at Jonathan, Chase, Cole, or Michael. Under the third theory, Martinez argues that the evidence was insufficient to show that he committed the underlying felony of aggravated assault. Although Martinez concedes that aiming a deadly weapon at someone is sufficient evidence of a threat to sustain an aggravated assault conviction, he argues that the State presented only a "modicum of evidence" that he aimed his shotgun at anyone. Our consideration of Martinez's argument concerning the third theory in the charge is dispositive of the issue whether the evidence was legally sufficient to support a finding that Martinez committed the offense of murder. *See* TEX. R. APP. P. 47.1.

A person commits the first-degree felony offense of murder if the person "commits or attempts to commit a felony, other than manslaughter," and "in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act

---

[8] The charge also instructed the jury on the lesser-included offense of aggravated assault based on the use or exhibition of a deadly weapon during commission of an assault. *See* TEX. PENAL CODE § 22.02(a)(2).

25

clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3). This provision is commonly referred to as the felony murder statute. *See Fraser v. State*, 583 S.W.3d 564, 565 & n.1 (Tex. Crim. App. 2019); *Gomez v. State*, 499 S.W.3d 558, 562 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). Under this provision, there is "no mens rea for the element of 'commit[ting] or attempt[ing] to commit an act clearly dangerous to human life that causes the death of an individual.'" *Gomez*, 499 S.W.3d at 562 (quoting TEX. PENAL CODE § 19.02(b)(3)).

Here, the underlying felony in the felony murder charge was aggravated assault. *See* TEX. PENAL CODE § 19.02(b)(3). A person commits the offense of aggravated assault if he commits an assault and uses or exhibits a deadly weapon during the commission of the assault.[9] *Id.* § 22.02(a)(2). A person commits an assault if he intentionally or knowingly threatens another with imminent bodily injury. *Id.* § 22.01(a)(2). The instructions in the jury charge tracked these statutory definitions.

As Martinez concedes, this Court has previously held that "[a]iming a deadly weapon at a supposed victim is sufficient evidence of a threat to sustain an aggravated assault conviction." *Ward v. State*, 113 S.W.3d 518, 521 (Tex. App.— Houston [1st Dist.] 2003, pet. ref'd) (citing *Anderson v. State*, 11 S.W.3d 369, 375–

___

[9] Martinez does not dispute that a firearm is a deadly weapon. *See id.* § 1.07(17) (defining "deadly weapon" to include "a firearm").

26

76 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd), and *Rodriguez v. State*, 955 S.W.2d 171, 174 (Tex. App.—Amarillo 1997, no pet.)). Martinez argues, however, that there was insufficient evidence that he aimed a gun at anybody. We disagree.

As Martinez approached Amy's house, he was armed with a shotgun and a handgun. He first encountered Amy standing at the front door. Amy testified that he was "armed" with the shotgun "in his hands" and "across his chest." He "looked aggressive" and "angry . . . like he was in a rage." She ran away from Martinez as he entered the house and walked towards the kitchen. Martinez then encountered Jonathan, who testified that when he first saw Martinez in the house, Martinez was holding the shotgun and Jonathan was "[i]n front of it" and "[c]lose enough to grab it." Jonathan grabbed the barrel of the shotgun and "pushed it away from [his] face." On cross-examination, Jonathan testified, "I just remember the shotgun in my face and then I don't know what happened to it . . . ." Michael, who was on the back patio adjacent to the kitchen during this time, testified that he saw "a guy coming in pointing a gun at [Jonathan], inside." Michael saw Martinez point the shotgun "[s]traight, directly at [Jonathan]." Martinez testified that he did not aim the shotgun at Jonathan. Immediately after encountering each other in the kitchen, a fight ensued between Jonathan and Martinez, and Michael, Chase, and Cole soon joined the fight. While fighting, Martinez had control of the handgun when it fired three bullets, one of which struck and killed Cole.

The jury reasonably could have credited Jonathan's and Michael's testimony and other reasonable inferences—and disbelieved Martinez's testimony—in finding that Martinez aimed the shotgun at Jonathan when they first encountered each other in the kitchen, prior to any physical altercation between the two. *See Dunham*, 666 S.W.3d at 482; *Mottin*, 634 S.W.3d at 765 ("The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all the evidence or testimony proffered, and weigh the evidence as it sees fit."). As Martinez concedes, evidence that he aimed a deadly weapon at Jonathan is sufficient to sustain a conviction for aggravated assault, the offense underlying the felony murder offense. *See Ward*, 113 S.W.3d at 521. We disagree with Martinez that Jonathan's and Michael's testimony constituted only a mere "modicum" of evidence that Martinez aimed the shotgun at anyone. *See Rankin*, 617 S.W.3d at 182. Furthermore, the evidence showed that Martinez had control of the handgun when it fired three shots, one of which killed Cole. *See* TEX. PENAL CODE § 19.02(b)(3); *Gomez*, 499 S.W.3d at 562 (stating that felony murder statute has no mens rea requirement for element of committing or attempting to commit act clearly dangerous to human life that causes death of individual). Considering the evidence in the light most favorable to the verdict, we conclude that any rational jury could have found the essential elements of the felony murder offense beyond a reasonable doubt. *See Dunham*, 666 S.W.3d at 482.

28

Martinez next argues that the evidence was legally insufficient to find against him on the defensive issues of self-defense or defense of a third person. Specifically, Martinez contends that he went to pick up Alexis after she reported that someone had tried to sexually assault her, and he feared for his and Alexis's safety when he went to Amy's house.

"[D]eadly force used in self-defense or in defense of another is a defense to prosecution for murder if that use of force is 'justified.'" *Braughton*, 569 S.W.3d at 606 (quoting TEX. PENAL CODE § 9.02 and citing *id.* §§ 9.31–.33). Under the Penal Code, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a). The person is justified in using *deadly* force if the actor would be justified in using force under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to defend against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of certain offenses, including sexual assault. *Id.* § 9.32(a). A person is justified in using force or deadly force against another to protect a third person if the actor would be justified in using force under section 9.31 or deadly force under section 9.32 and "the actor reasonably believes that his intervention is immediately necessary to protect the third person." *Id.* § 9.33. A "reasonable belief" is "a belief

29

that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

The Penal Code lists several exceptions to self-defense and defense of others. For example, a person is not justified in using force in response to verbal provocation alone or if the actor provoked the other person's use or attempted use of unlawful force. *Id.* § 9.31(b)(1), (4); *see id.* § 9.33 (stating that person is justified in using force to protect third person if, among other things, actor reasonably believes actor would be justified under section 9.31 or 9.32 in using force or deadly force); *Braughton*, 569 S.W.3d at 606.

At trial, Martinez testified that Alexis called him from Amy's house in the middle of the night on FaceTime. He could see Alexis was crying and hysterical, and she asked him to pick her up because "[s]he had been assaulted, sexually assaulted." Amy then took the phone from Alexis and left the room. Amy spoke to Martinez and gave him the address to her house. Martinez got dressed and grabbed his handgun and shotgun. Martinez testified that he was scared for himself and Alexis as he drove to Amy's house. When he arrived at the front gate to Amy's neighborhood, Martinez called Alexis's phone, and Amy answered and gave Martinez the code to enter the gate. Martinez went through the gate and parked in front of Amy's house.

Martinez approached Amy's house with the handgun hidden in his waistband and the shotgun in a sling over his shoulder. Amy saw Martinez at the front door with the shotgun across his chest, but she did not say anything. Instead, she ran away from him. Martinez walked into the house and towards the kitchen area, where he pointed a shotgun at Jonathan upon encountering him. Two witnesses testified that Martinez pointed the shotgun at Jonathan. Jonathan and Martinez fought, turning over the kitchen table. They went to the ground, causing the shotgun to fly away from them. Michael, Chase, and Cole entered the kitchen and assisted Jonathan in fighting Martinez. Martinez believed someone was reaching for the gun in his waistband, so he "decided to just take it out and reach as far as [he] could with . . . [his] right hand" to prevent the others from taking it from him. The gun fired three times and jammed on the fourth attempted firing. Martinez denied that he pulled the trigger, although he acknowledged that Cole was shot and killed with a bullet from his gun. The fight ended when Jonathan took the gun from Martinez and emptied the bullets. Martinez did not see Alexis until the fight ended.

These facts indicate that Martinez did not have a reasonable belief that force or deadly force was immediately necessary to protect himself or Alexis. *See* TEX. PENAL CODE §§ 9.31(a), 9.33. Martinez would be justified in using force to protect Alexis if he would be justified in using force to defend himself against the unlawful force or deadly force that he reasonably believed to be threatening Alexis and if he

31

reasonably believed that his intervention was immediately necessary to protect Alexis. *See id.* § 9.33; *see also id.* § 9.31(a). Although Alexis told Martinez over the phone that she had been sexually assaulted, Martinez did not see or speak to Alexis again until after the fight at Amy's house and after Cole had been shot. No evidence indicated that Martinez had a reasonable belief that Alexis was in imminent danger or under any threat of harm while he was at Amy's house prior to the shooting. *See id.* § 9.33. We conclude that any rational jury could have found against Martinez on the issue of defense of a third person beyond a reasonable doubt. *See Dunham*, 666 S.W.3d at 482.

Similarly, any rational jury could have found against Martinez on the issue of self-defense beyond a reasonable doubt. *See id.* There is no evidence that anyone used or attempted to use force against Martinez before he aimed the shotgun at Jonathan. *See* TEX. PENAL CODE § 9.31(a). Rather, Amy retreated from Martinez when she saw him armed with a shotgun, and Martinez caught Jonathan unaware in the kitchen before aiming a shotgun at him, which caused the fight between them. As stated above, aiming the shotgun at Jonathan constituted an aggravated assault, and Jonathan was justified in using force to defend himself against Martinez's use or attempted use of unlawful force. *See id.*; *Ward*, 113 S.W.3d at 521. During the fight—while Martinez had control of the gun—Martinez fired three shots (and a fourth that misfired). One of these bullets hit Cole, who was standing only inches in

front of the barrel. Thus, the evidence establishes that Martinez provoked the actions of Jonathan, Michael, Chase, and Cole by entering a strange house armed with two guns and aiming a shotgun at Jonathan without any apparent justification to do so. *See* TEX. PENAL CODE § 9.31(b)(4) (providing that use of force against another is not justified if actor provoked other's use or attempted use of unlawful force). We conclude that any rational trier of fact could have found against Martinez on the self-defense issue beyond a reasonable doubt. *See Dunham*, 666 S.W.3d at 482. We therefore hold that the evidence was legally sufficient to support the jury's guilty verdict. We overrule Martinez's third issue.

## Evidentiary Issue

In his fourth issue, Martinez contends that the trial court abused its discretion by overruling his request to admit certain impeachment evidence.

### A. Standard of Review and Governing Law

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019); *Gutierrez v. State*, 668 S.W.3d 46, 53 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Gutierrez*, 668 S.W.3d at 53 (quoting *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019)). We will uphold the trial court's ruling if it is reasonably supported by the record and correct

under any theory of law applicable to the case. *Id.*; *see McDonnell v. State*, 674 S.W.3d 694, 701 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (stating that appellate court will not reverse trial court's ruling on admissibility of evidence if ruling is within zone of reasonable disagreement).

Generally, relevant evidence is admissible. TEX. R. EVID. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." TEX. R. EVID. 401. Any party may attack a witness's credibility by opinion testimony about the witness's character. TEX. R. EVID. 607, 608(a). However, "a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b).

## B.    Analysis

At trial, Alexis testified that she believed Jonathan had sexually assaulted her during the party at Amy's house. Jonathan denied the accusation. Amy testified that Jonathan was downstairs with her and the others and that he therefore could not have been upstairs when the sexual assault allegedly occurred. Martinez argues that the State portrayed Alexis as lying about the sexual assault accusation, and he therefore sought to impeach Amy's testimony by introducing evidence that Amy knew about two prior instances in which Jonathan "inappropriately touched" other women,

34

which would show that Amy was lying about not believing Alexis's accusation that Jonathan had sexually assaulted her. Martinez argues that without an opportunity to impeach Amy's testimony, he was prevented from establishing that he acted in self-defense or defense of Alexis.

The issue of the alleged sexual assault against Alexis has limited relevance to the criminal proceeding against Martinez. That is, Alexis's accusation explains why Martinez appeared at Amy's house and tends to support Martinez's defensive theory that he arrived with weapons to protect himself and Alexis. But whether Alexis's accusation was truthful is not particularly relevant in this case because the uncontroverted evidence establishes that Martinez believed the accusation, which is the reason he went to Amy's house. *See* TEX. R. EVID. 401 (stating that evidence is relevant if it tends to make fact of consequence more or less probable than it would be without such evidence). The defenses of self-defense and defense of a third person depend on whether Martinez reasonably believed that force or deadly force was immediately necessary to protect himself or Alexis from another's use or attempted use of unlawful force or deadly force or to prevent the commission of a sexual assault. *See* TEX. PENAL CODE §§ 9.31(a), 9.32(a), 9.33. Thus, in considering Martinez's reasonable belief when he entered Amy's house, fought with Jonathan and the other men, and ultimately shot and killed Cole, it is appropriate to consider that Martinez believed Alexis's sexual assault accusation, regardless of its veracity.

35

Whether or not Amy lied about disbelieving Alexis's accusation specifically directed at Jonathan does not alter what Martinez believed when he went to Amy's house.

Moreover, the evidence indicates that Amy's belief about Jonathan not being involved in the alleged sexual assault was based on her seeing him downstairs at the party when the sexual assault allegedly occurred in an upstairs room. Even if the unadmitted evidence showed that Amy knew Jonathan had previously "inappropriately touched" two other women, that does not impeach her testimony that she saw Jonathan downstairs at the party during the relevant time. We therefore hold that the trial court did not abuse its discretion by overruling Martinez's request to impeach Amy's testimony. We overrule Martinez's fourth issue.

## Conclusion

We affirm the judgment of conviction.

April L. Farris
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).